UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-00913

GAYS AGAINST GROOMERS, a non-profit corporation;
ROCKY MOUNTAIN WOMEN'S NETWORK, an unincorporated association;
RICH GUGGENHEIM, an individual; and
CHRISTINA GOEKE, an individual,

    Plaintiffs,

v.

LORENA GARCIA, in her individual and official capacities as a Colorado State Representative;
MIKE WEISSMAN, in his individual and official capacities as a Colorado State Representative and Chair of the House Judiciary Committee;
LESLIE HEROD, in her individual and official capacities as a Colorado State Representative;
JULIE GONZALES, in her individual and official capacities as a Colorado State Senator and Chair of the Senate Judiciary Committee; and
DAFNA MICHAELSON JENET, in her individual and official capacities as a Colorado State Senator,

    Defendants.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

**INTRODUCTION**

Americans disagree profoundly about transgender ideology. Some question the existence of biological sex and claim a scientific basis for a transgender worldview. To them, the sudden spike in individuals claiming transgender status in large urban centers is a sign of increased tolerance, acceptance, and knowledge. Others claim that there are only two sexes—that transgenderism is a social contagion, preys on the young and confused, or is a form of sexual mimicry that undermines the civil rights of women or gay Americans. Others see it as an outgrowth of queer theory, a strain of academic critical theory that seeks to "queer" existing categories. Many Americans aren't sure about all this and are still figuring out what to think about trans ideology. In a pluralistic society, it is expected that people may disagree about issues as fundamental as biology, sex, and identity.

Defendants—Colorado Legislators and proponents of transgender ideology—are abusing their authority to put a thumb on the scale of the public's debate about transgenderism. They have prescribed how critics of transgenderism must present their views during the public-testimony portion of committee hearings before the Colorado Legislature by prohibiting "misgendering" or "deadnaming" and otherwise requiring citizens to express fealty to transgender ideology under the guise of "respect," "civility," or "decorum." And they have elevated favored transgender exemplars, including legislative namesakes, above criticism. For those citizens who do not submit, Defendants silence their speech, even going so far as to erase it from the public record.

The First Amendment does not allow Defendants to force their ideological beliefs on Plaintiffs in this manner. Plaintiffs are entitled to preliminary relief securing their fundamental rights to free expression and petition and freedom from compelled speech. In addition, Plaintiffs are also entitled to relief on an expedited basis because the legislature is still in session, a trans-related bill remains under discussion, and a committee hearing could be set on short notice.

**FACTS AND BACKGROUND**

The Colorado General Assembly is the state legislature for Colorado and is a bicameral legislature, comprised of the House of Representatives and Senate. During the current, ongoing regular session, Colorado's legislators have considered several bills concerning transgender issues. Guggenheim Dec. ¶¶ 51-54. The Assembly provides citizens with an opportunity to provide public comment on pending legislation in the form of "testimony" at a committee hearing. Dkt. 1-1. One administrative rule governing public speech before legislative committees states that the "chair has the discretion and authority to limit testimony, ask the sergeant-at-arms to remove a disruptive person from the committee room, and clear the public from any hearing in the event of a disturbance that is disruptive to legislative proceedings." *Id.* at 5.

The Assembly invites members of the public to sign up to speak via an online portal, which requires speakers to indicate their name, phone, email address, whether the speaker is representing him or herself or an organization, and whether they wish to speak in favor, against, neutrally, for amendment, or questions only on a pending bill. Gugg. Dec. ¶¶ 22-23; Ex. F. Speakers also have the option to select their pronouns. *Id.;* Gugg. Dec. ¶ 22. In addition, the Colorado House has published an online Guide to Public Hearings, which provides administrative rules that prohibit booing, cheering, or applauding during the hearing, and states the chair can have the sergeant-at-arms remove disruptive persons. *See* https://perma.cc/5L6L-GRBQ. The Colorado Senate publishes a functionally identical guide: https://perma.cc/DGU2-WYCX.

HB24-1071 would make it easier for transgender individuals with felony convictions to legally change their names. Gugg. Dec. ¶¶ 18-20; Goeke Dec. ¶¶ 8-11. The Prime Sponsors of HB24-1071 include Defendant Rep. Garcia and Defendant Sen. Michaelson Jenet. https://perma.cc/55LY-4FBB. HB24-1071's sponsors and supporters also refer to it as "Tiara's law," Tiara being the assumed name of a biological male with

a criminal record. Gugg. Dec. ¶ 20; Goeke Dec. ¶ 10-11. Tiara is legally known as Duane Powell, a.k.a. Duane Antonio Kelley or Tiara Latrice Kelley, and has numerous criminal convictions, which record him as a male. *Id.* Because Powell's criminal history currently prevents him from legally changing his name in Colorado, Powell has advocated for a change in the law. Dkt. 1-2 at 7-9.

Plaintiffs Rich Guggenheim and Christina Goeke, both as individuals and as members of Gays Against Groomers (GAG) and Rocky Mountain Women's Network (RMWN), respectively, oppose HB24-1071 because they believe it will make it easier for transgender individuals to conceal criminal convictions, posing a danger to children, women, and vulnerable populations. Gugg. Dec. ¶ 20; Goeke Dec. ¶¶ 10-12. They also disagree with the concepts of "misgendering" or "deadnaming." Gugg. Dec. ¶ 28; Goeke Dec. ¶ 17. Plaintiffs consider adherence to a transgender person's pronoun preferences, assumed gender, or assumed name to be a form of lying; and both Guggenheim and Goeke consider pronoun rituals, and the concepts of deadnaming and misgendering, to be degrading and demeaning to themselves. Gugg. Dec. ¶¶ 28, 55-56; Goeke Dec. ¶¶ 17, 49-51.

Both Goeke and Guggenheim signed up to speak on HB24-1071 in person before the House Judiciary Committee on January 30, 2024, although Guggenheim signed up to comment remotely. Gugg. Dec. ¶ 21; Goeke Dec. ¶ 13. When the bill came up for comment, Defendant Rep. Garcia thanked her colleagues "for engaging in respectful discourse by not using derogatory language or misgendering witnesses or using a witness's deadname. But rather referring to the witnesses as their stated names and gender pronouns." Dkt. 1-2 at 3-4. Chair Weissman "affirmed and ratified" these rules. Dkt. 1-2 at 4.

Upon hearing these rules, Guggenheim left his place in line. Gugg. Dec. ¶ 29. He could not deliver his views and GAG's views if he could not use language he was

3

certain would be deemed "derogatory" about the bill's namesake, or use language denying the validity of trans ideology. *Id.* ¶¶ 30, 35; Ex. G (text of intended speech).

Goeke, who had been patiently waiting her turn to speak in person, did not get all the way through her presentation before being repeatedly interrupted by Defendant Rep. Weissman for violating Defendants' customs, practices, or policies against deadnaming, misgendering, and using allegedly "disrespectful" language about another person. Dkt. 1-2 at 18-20; Goeke Dec. ¶¶ 18, 20-26. Rep. Herod yelled at Goeke to "stop" and gestured to the sergeant-at-arms to remove her. Goeke Dec. ¶¶ 22-23. When pro-trans audience members booed or hissed at Goeke during her speech, Chair Weissman did not enforce his decorum rule against them. Goeke Dec. ¶ 21; Ex. E (video with hissing). Goeke was not allowed to use her full three minutes of allotted speaking time. Goeke Dec. ¶ 26. When Chair Weissman loudly brought down the gavel, ending Goeke's testimony, Goeke still had 31 seconds left on the clock. *Id.* Later, as the hearing was drawing to a close, Rep. Herod said that Tiara had faced "violence" at the hearing (Dkt. 1-2 at 29) and Vice-Chair Bacon bragged about restricting speech. Dkt. 1-2 at 32-33. Other speakers representing pro-trans viewpoints were able to give their testimony without being interrupted, having their time limited or terminated, or being excluded from the hearing, including Duane Powell/Kelley/Tiara, and representatives from pro-trans groups such as Bread and Roses, the ACLU, Parasol Patrol, and Black Sex Workers of Colorado. Dkt. 1-2.

On March 27, 2024, the Senate Judiciary Committee held a hearing on HB24-1071, which provided for public comment. Gugg. Dec. ¶ 36; Goeke Dec. ¶ 29. Both Goeke and Guggenheim signed up to speak in-person and in opposition to the bill. *Id.* At the opening of public comment about the bill, Defendant Chair Gonzalez announced that she would not allow witnesses to fail to treat others with dignity and respect or a lack of decorum, and she threatened to have witnesses removed if they failed to exhibit

4

decorum, dignity, or respect. Dkt. 1-3 at 2-3. Sen. Michaelson Jenet spoke next and purported to "elevate" the words of Chair Gonzalez by announcing that witnesses should not use "derogatory language," "misgender," "deadname," or otherwise "disparage" those present. *Id.* at 5. Chair Gonzalez adopted Sen. Michaelson Jenet's speech restrictions. *Id.*

Goeke spoke in opposition to the bill arguing that it would allow felons to conceal their criminal history and endanger single moms, young women, or children. *Id.* at 11-12. When she attempted to refer to "Tiara" as "Mr. Duane Powell," Chair Gonzalez gaveled Goeke down and interrupted her. *Id.* Goeke attempted to state her opinion that Duane Powell was impersonating a woman and appropriating a female name. *Id.;* Goeke Dec. ¶¶ 30-38.

In response, Chair Gonzalez enforced her speech rules against deadnaming or misgendering. Dkt. 1-3 at 11-12; Goeke Dec. ¶¶ 34-38. Goeke stated that she would not tell a lie and that "[a] man is a man." Dkt. 1-4 at 3-5. Chair Gonzalez reminded Goeke that she was not allowed to deadname or misgender. *Id.* Goeke responded that she would not lie and could not advocate for women if she is not allowed to say what a woman is. *Id.*

Chair Gonzalez told Goeke she had 24 seconds left to testify, but she again gaveled over Goeke's speech and cut-off Goeke's time as soon as Goeke dissented from trans ideology by saying "Mr. Duane Powell," and Goeke was not allowed to complete her public comment. Goeke Dec. ¶¶ 37-38; Dkt. 1-4 at 3-5. Significant portions of Ms. Goeke's speech were later erased from the state's audio record of the Senate Judiciary Committee hearing. Goeke Dec. ¶¶ 39-43; *compare* Dkt. 1-3 at 11-12 *with* Dkt. 1-4; Ex. E.

Guggenheim also spoke in opposition to the bill. Gugg. Dec. ¶¶ 36-50. Guggenheim stated he was speaking as a homosexual man, and he attempted to share historical

5

facts about the gay liberation movement from Stonewall in 1969 by discussing Malcom Michaels Jr., and Tony Rivera, two (now long-deceased) black gay male sex workers and drag queens often falsely referred to as transgender women named Marsha P. Johnson and Sylvia Rivera. *Id.* ¶¶ 41-48; Ex. H (text of intended speech). Although neither of these historical persons was present, Chair Gonzalez interrupted Guggenheim, attempted to cut his microphone, and reminded Guggenheim of the rule against deadnaming or misgendering. Gugg. Dec. ¶¶ 44-48; Dkt. 1-3 at 14-16. Guggenheim was not allowed to complete his testimony and Chair Gonzalez cut off almost half of his time to speak against the bill. Gugg. Dec. ¶ 46.

During the hearing, proponents of the bill were not interrupted or silenced. Dkt. 1-3; Gugg. Dec. ¶ 49; Goeke Dec. ¶ 44. At times, at least one pro-trans audience members raised his hands or attempted to signify when they believed a witness was transgressing the speech restrictions against deadnaming or misgendering. *Id.;* Gugg. Dec. ¶ 49. The legislative session has not yet ended and, even when it does, the next regular session will begin a mere seven months later, with the prospect of an interim session addressing future bills between May and next January. Gugg. Dec. ¶¶ 51-54. Defendants, along with others in the Colorado legislature, are expected to continue to push trans ideology in their proposed laws. Goeke Dec. ¶ 48; Gugg. Dec. ¶ 55. Both Guggenheim and Goeke intend to keep submitting public testimony on bills and other legislative issues that would oppose against trans ideology. Goeke Dec. ¶¶ 50-51; Gugg. Dec. ¶¶ 56. Thus, both face the prospect of self-censorship or state censorship during future public comments on trans issues. Goeke Dec. ¶¶ 52-53; Gugg. Dec. ¶¶ 57-58.

6

## ARGUMENT

### I. PLAINTIFFS WILL SUCCEED ON THE MERITS

Preliminary injunction movants bear the burden of establishing that four factors weigh in their favor: (1) a likelihood of success on the merits; (2) a likelihood that they will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-21 (2008))*.* In the First Amendment context, "the likelihood of success on the merits will often be the determinative factor" because of the seminal importance of the interests at stake. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) Moreover, the government bears the burden of proving that speech restrictions are constitutional. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1130-31 (10th Cir. 2012) (citations omitted). Plaintiffs easily meet this standard because Defendants openly declared their intent to restrict viewpoints during public comment—and then applied those speech restrictions.

#### A. The public testimony portions of legislative committee hearings are limited public fora

Forum analysis often determines the applicable constitutional standard in speech cases. *Gilmore v. Beveridge*, No. 2:22-cv-02032-HLT-RES, 2022 U.S. Dist. LEXIS 140026, at *12-13 (D. Kan. Aug. 5, 2022) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). Here the forum is the "public testimony" or public comment portion of Colorado legislative committee hearings, where the House and Senate have opened part of their committee hearings to input from members of the public. They have provided citizens with "an opportunity to express their views and have them incorporated into the official legislative record[,]" and speak for or against bills, speak neutrally, answer questions, or advocate for amendment. Dkt. 1-1; Ex. F. The public-comment portions of the hearings are limited public fora.

In such fora, the government may impose reasonable, content-based speech restrictions that preserve the purposes of the forum, but it may not engage in viewpoint discrimination. *Summum v. Callaghan*, 130 F.3d 906, 917 (10th Cir. 1997) (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995)); *Gilmore,* U.S. Dist. LEXIS 107582 at *14-15 (citing *Summum).* "Legislative meetings that permit public comment are typically considered limited public forums." *Komatsu v. City of N.Y.*, No. 20-CV-7046 (ER), 2021 U.S. Dist. LEXIS 14522, at *4 (S.D.N.Y. Jan. 26, 2021) (citations omitted); *Young v. Cortune*, No. 17-329 (NLH/KMW), 2019 U.S. Dist. LEXIS 107928, at *12-13 (D.N.J. June 26, 2019) (State Senate Budget and Appropriations Committee hearing on state takeover of Atlantic City was a limited public forum); *see also Wenthold v. City of Farmers Branch*, No. 3:11-CV-0748-B, 2012 U.S. Dist. LEXIS 18452, at *24-26 (N.D. Tex. Feb. 14, 2012) (collecting cases).

While the Tenth Circuit has never addressed whether the public-comment portions of legislative hearings are limited public fora, other courts have, and that conclusion comports with Tenth Circuit precedent. *Compare Shero v. City of Grove,* 510 F.3d 1196, 1202-03 (10th Cir. 2007) (not reaching question of whether a city council meeting is a designated or limited public forum); *Griffin v. Bryant*, 677 F. App'x 458, 462 n.7 (10th Cir. 2017) (not deciding forum issue in village-council context) *with Doe*, 667 at 1129-30 (city libraries are designated public fora); *Galena v. Leone*, 638 F.3d 186, 198-99 (3d Cir. 2011) (county council meeting is a limited public forum); *Norse v. City of Santa Cruz*, 629 F.3d 966, 975-76 (9th Cir. 2010) (city council meeting is a limited public forum); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1180-81 (D.N.M. 2014) (holding that city council meetings are limited public fora; collecting out-of-circuit cases).

This conclusion is similarly supported by the Tenth Circuit test for determining the existence of a limited public forum, non-public forum, or designated public forum, that is: "(1) the purpose of the forum; (2) the extent of use of the forum; and (3) the

government's intent in creating a designated public forum." *Callaghan,* 130 F.3d at 915; *Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012).

Here the stated purpose for "public testimony" at legislative committee hearings is so that "citizens have an opportunity to *express their views* and have them incorporated into the official legislative record." Dkt. 1-1 at 1 (emphasis added). Moreover, both the online sign-up interface for public comment, as well as the transcript of both committee hearings in this case establish a record of allowing members of the public to use that forum to speak in support of a bill, criticize a bill, express neutrality, or advocate for amendment. Dkt. 1-2, 1-3; Ex. F. In the two hearings at issue in this case, however, Defendants improperly sought to limit the way in which the public could criticize HB24-1071, while letting proponents speak freely.[1]

Even if this Court concludes that the public-comment portions of legislative committee hearings are not limited public fora, but are instead designated public fora or non-public fora,[2] it does not matter, because Defendants violated a cardinal rule of the First Amendment by engaging in viewpoint discrimination.

### B. Viewpoint discrimination is presumptively illegal

While Defendants invited the public to comment on "Tiara's" law, they made it clear that no speaker would be allowed to "deadname" or "misgender" the bill's namesake, by, for example, arguing that "Tiara" is a man named Duane Powell (a.k.a. Duane Kelley), or "disparage" Powell by noting his extensive criminal history and arguing that he should

---

[1] Of course, Defendants can enforce reasonable restrictions in that forum, such as limiting public comments to the bills on the committee agenda, enforcing time-limits, or preventing audience members from interrupting others' testimony. But that is not what is happening here.

[2] In designated public fora all content-based restrictions must survive strict scrutiny, while reasonable content-based restrictions are allowed in non-public forums. *Shero,* 510 F.3d at 1202-03; *Callaghan*, 130 F.3d at 916; *Farnsworth v. City of Mulvane*, 660 F. Supp. 2d 1217, 1225-26 (D. Kan. 2009). But viewpoint discrimination is not.

9

not be featuring minors in burlesque shows. This is textbook viewpoint discrimination. When the government opens a forum for discussion on a topic—in this case "Tiara's law"— the government may not pick and choose which viewpoints will be heard. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger,* 515 U.S. at 831. While Defendants could restrict speakers to the topic of "Tiara's law" (a content restriction), they could not restrict which viewpoints speakers expressed on that topic or proscribe how speakers chose to craft their message. Nor could they require speakers to be "respectful" in their criticisms.[3]

"The prohibition on viewpoint discrimination is black letter law[.]" *Gilmore,* 2023 U.S. Dist. LEXIS 107582, at *15-17. "In the realm of private speech or expression, government regulation may not favor one speaker over another . . . Discrimination against speech because of its message is presumed to be unconstitutional." I*d.* at 828-29 (cleaned up); *see also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) (striking down state law because it "places pro-animal facility viewpoints above anti-animal facility viewpoints"). "Except possibly with respect to topics such as obscenity, viewpoint discrimination is almost universally condemned and rarely passes constitutional scrutiny." *Mesa v. White*, 197 F.3d 1041, 1047 (10th Cir. 1999).[4]

---

[3] Defendants selectively restricted "disparagement" and called for "civility," "respect," and "decorum." Plaintiffs refer to these collectively as the requirement that speech be "respectful."

[4] Unprotected speech, such as criminal threats, fighting words, or legal obscenity, can of course be restricted, but Plaintiffs' speech was protected political opinion. *See Animal Legal Def. Fund,* 9 F.4th at 1229. Even when restricting fighting words, the government may not discriminate among viewpoints. *R. A. V. v. St. Paul*, 505 U.S. 377, 391-92 (1992).

Defendants also may not rely on the canard that offensive speech can be banned because it might upset some listeners or because speakers could choose to express their views in ways government officials find to be nicer or more civil. The government may not discriminate against ideas that offend. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (plurality) ("Giving offense is a viewpoint."); *Cohen v. California*, 403 U.S. 15, 25 (1971) ("… it is nevertheless often true that one man's vulgarity is another's lyric."). "A viewpoint need not be political; any form of support or opposition to an idea could be considered a viewpoint." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 421 (E.D. Pa. 2021) (citations omitted). So too with the concepts of misgendering or deadnaming.

Moreover, the First Amendment "protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Matal,* 137 S. Ct. at 1766 (Kennedy, J., concurring). And the government may not rely on "audience reaction" (or the "hecklers veto") to restrict speech. *Id.* at 1763, 1766.

Likewise, Colorado legislators may not prevent Americans from criticizing favored groups such as government employees, trans people, or the claimed namesake of "Tiara's law." For example, proscribing comments that are "abusive" or "personally directed" is a form of impermissible viewpoint discrimination. *Ison v. Madison Local Sch. Dist. Bd. of Educ.,* 3 F.4th 887, 895 (6th Cir. 2021) (policy's "restrictions on abusive, personally directed, and antagonistic speech, facially and as-applied, violate the First Amendment"); *Marshall,* 571 F. Supp. 3d at 422 (enjoining school board's restriction on offensive racial stereotypes); *Mama Bears of Forsyth Cty. v. McCall*, 642 F. Supp. 3d 1338, 1351-52 (N.D. Ga. 2022) (enjoining school board's restrictions on disrespectful or personally directed speech). Americans must be able to name names and talk about specific people when relevant to the topic. In this case the bill in question was promoted by its supporters as "Tiara's law," meaning that a robust discussion about who Tiara is

11

and why that matters was open to debate—even on terms some might find uncomfortable, hurtful, or unkind. Indeed, history has shown that most people, especially officials wielding government power, often do not like having their views challenged. And that is exactly why we have the First Amendment.

Defendants do not have a legal basis to survive strict scrutiny or justify viewpoint discrimination. It is not enough to say that they wanted to spare their constituents or political supporters from discomfort or feeling unsafe. They announced their viewpoint-based speech restrictions and then applied them.

There is also no real dispute that Defendants acted intentionally[5] when the record shows they sought to limit Plaintiffs' speech about "Tiara's law" by banning "deadnaming" and "misgendering," and also by mandating "respectful discourse." Dkt. 1-2 at 3-4; Dkt. 1-3 at 2-3, 5-5. And they acted on these openly stated intentions by applying their restrictions in multiple instances against critics of "Tiara's law" and trans ideology. Dkt. 1-2 at 19-20; Dkt. 1-3 at 11-12, 15-17; Dkt. 1-4 at 3-5; Goeke Dec. ¶¶ 20, 22-24, 34, 36-38; Guggenheim Dec. ¶¶ 44-46. Even worse, they later went back and erased much of Christina Goeke's Senate speech from the audio record. Goeke Dec. ¶ 39; *compare* Dkt. 1-3 at 12 ("No audio from 6:34:41 PM to 6:36:35 PM") *with* Dkt. 1-4 at 3-5 (transcribing erased comments). Defendants found Ms. Goeke's comments to be so offensive that it was not enough to interrupt her and cut her off—her sentiments had to scrubbed from history altogether.

---

[5] In the Tenth Circuit, a § 1983 claim asserting viewpoint discrimination must be supported by evidence of a viewpoint-discriminatory purpose. *Pahls v. Thomas*, 718 F.3d 1210, 1230-31 (10th Cir. 2013). The terms "purpose," "intent," and "motive" are interchangeable in this context. *Id.* at 1237, n.9.

### C. The General Assembly's decorum rules for public testimony are vague and allow for excessive enforcement discretion

"Allowing government officials to make decisions as to who may speak [in a government forum], without any criteria or guidelines to circumscribe their power, strongly suggests the potential for unconstitutional conduct, namely favoring one viewpoint over another. *Callaghan,* 130 F.3d 920. A lack of written standards invites post-hoc rationalizations. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). Officials' "discretion must be guided by objective, workable standards." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018). "Allowing little more than the presiding officer's own views to shape 'what counts' as irrelevant, intolerant, abusive, offensive, inappropriate, or otherwise inappropriate under the policies openly invites viewpoint discrimination." *Marshall,* 571 F. Supp. at 424. So too here.

Defendants' administrative rules allow the chair to "limit testimony," order removal of a "disruptive person" (Dkt. 1-1 at 5), or ensure "decorum" (https://perma.cc/5L6L-GRBQ). Those terms are undefined and lack objective standards, allowing Defendants to invent new decorum rules that censor speech they find too disagreeable or offensive, in violation of the First Amendment.

### D. Forcing speakers to use preferred pronouns, assumed names, or genders is a form of compelled speech

"Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning[.]" *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). "The crucial question is whether, in speaking, the government is *compelling* others to espouse or to suppress certain ideas and beliefs." *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247-48 (10th Cir. 2000) (citing *Barnette, Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977)). Here, Defendants' speech rules require Plaintiffs to adopt trans ideology by refraining from "deadnaming" or "misgendering" or from speaking "disrespectfully"

13

about "Tiara" or else lose the right to speak about pending bills. Goeke Dec. ¶¶ 15, 16, 31, 32, 36; Guggenheim Dec. ¶¶ 25, 26, 38, 39, 44. Defendants' restrictions sought to compel speech in violation of the First Amendment.

## II.  THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020); *Verlo,* 820 F.3d at 1126. In balancing the equities, courts "must give the benefit of any doubt to protecting rather than stifling speech . . .[and] [w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *FEC v. Wisc. Right to Life*, 551 U.S. 449, 474 (2007); *see also Awad v. Ziriax,* 670 F.3d 1111, 1131-32 (10th Cir. 2012). The public interest favors the enforcement of constitutional rights, especially when it comes to political speech. *Citizens United v. Gessler,* 773 F.3d 200, 212, 218-19 (10th Cir. 2014). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad,* 670 F.3d at 1132 (internal quotation marks omitted).

Moreover, there remains an ongoing risk of irreparable harm because Defendants may again apply their speech restrictions to Defendants. *See Griffin,* 30 F. Supp. 3d at 1200 ("[T]he Court concludes that Griffin may face irreparable harm -- in the form of being subjected to the same injurious deprivation of speech to which he has already been subjected -- if the injunction is not issued.").

## III.  THE COURT SHOULD WAIVE THE BOND REQUIREMENT

"Trial courts have wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling,* 552 F.3d at 1215; *see also United Utah Party v. Cox,* 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (waiving the bond requirement when a preliminary injunction "enforces fundamental constitutional rights against the government"). As an

14

injunction securing Plaintiffs' First Amendment rights could not financially injure the state, a bond is not needed.

## CONCLUSION

This Court should grant Plaintiffs' motion for preliminary injunction enjoining Defendants' speech restrictions on "deadnaming," "misgendering," and "respectful discourse" and as otherwise set forth in the proposed order.

Dated: April 16, 2024

Respectfully submitted,

   *s/Endel Kolde*
Endel Kolde
Brett R. Nolan
Courtney Corbello
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C.  20036
(202) 301-1664
(202) 301-9500
(202) 985-1644
dkolde@ifs.org
bnolan@ifs.org
ccorbello@ifs.org

*Attorneys for Gays Against Groomers, Rocky Mountain Women's Network, Rich Guggenheim and Christina Goeke*

15

### CERTIFICATE OF ATTORNEY CONFERRAL AND SERVICE

In accordance with D.C.COLO.LCivR 7.1, I hereby certify that on April 10, 2024 I emailed Ed DeCecco, Director of Office of Legislative Legal Services, the in-house, nonpartisan legal counsel representing the Colorado General Assembly, who previously accepted service of the summonses and complaint for all Defendants, asking to confer re Plaintiff's impending motion for a preliminary injunction. He responded that he would pass my message along to retained counsel, but did not identify that counsel.

On April 15, 2024, I again emailed Mr. DeCecco, asking for an update on our request to confer, and informed him that we were planning to file this motion on April 16, 2024.

Today, I exchanged emails with Ed Ramey, who identified himself to me as retained counsel for defendants. We also spoke via telephone today and were not able to resolve Plaintiffs' request for a preliminary injunction.

Mr. Ramey indicated that he would be entering a notice of appearance soon, and that in the meantime I could email him all of the filings. Mr. Ramey declined my offer of service of paper copies of these filings.

Copies of this motion and supporting documents were served by me on defense counsel via the email address below:

Edward T. Ramey

Tierney Lawrence Stiles

225 E. 16th Avenue, Suite 350

Denver, CO 80203

*eramey@TLS.legal*

Executed under penalty of perjury on April 16, 2024.

*s/Endel Kolde*